IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

NOLAN SIDNEY BIESANZ, JR.                                    PLAINTIFF

v.                          Civil No. 09-5087

SHERIFF KEITH FERGUSON ET AL.                               DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Nolan Sidney Biesanz, Jr. ("Plaintiff"), currently an inmate in the Arkansas Department of Correction, filed this civil rights action under 42 U.S.C. § 1983. Plaintiff's claims stem from his confinement at the Benton County Detention Center (BCDC) and he names as Defendants: Sheriff Keith Ferguson, Capt. Hunter Petray, Dr. Huskins, and Deputy Morrison. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) (2005), the Honorable Jimm Larry Hendren, Chief United States District Judge for the Western District of Arkansas, referred this case to the undersigned for the purpose of making a report and recommendation.

Now before this Court is the Motion for Summary Judgment filed by the Defendants herein. (Doc. 19). The Court has also considered the Response filed by the Plaintiff, through a questionnaire submitted to him by the Court. (Doc. 26)

### I.   Background

As this case is before the Court on Defendants' Motion for Summary Judgment, the Court will state the relevant facts as pled by the non-moving party, the Plaintiff. Plaintiff has brought his claims against the Defendants in both their official and individual capacities. (*Id.* at ¶ 1). Plaintiff's official capacity claims are that there were policies of refusing medical care, housing well inmates with sick inmates without disclosing the illnesses of sick inmates, and failing to disinfect the day room or dishes. (*Id.*)

Plaintiff's individual capacity claims are that Defendants denied or delayed him adequate medical care for a dental problem, that Defendant Morrison put shampoo in his food, and that he was housed with inmates from whom he could contract serious diseases.

Plaintiff was booked into the BCDC as a sex offender, charged with Rape, a Class Y felony, on January 7, 2009. (*Id.* at ¶ 2). Plaintiff signed the inmate medical insurance information form agreeing to be responsible for any/all medical bills for pre-existing injury or illness prior to incarceration. (*Id.* at ¶ 3). Plaintiff also completed a medical intake questionnaire and stated he was allergic to penicillin and that all of his teeth hurt. (Doc. 26, ¶ 4). Plaintiff had been told to brush his teeth with "sinsadin" because the hot and cold hurt his teeth, but the Defendants "would not let [him] get some." (*Id.*)

On January 13, 2009, Plaintiff complained his mouth was hurting and that he was due to have some teeth pulled but "was locked up." (*Id.* at ¶ 5). The response to the grievances was that Plaintiff was to see the doctor. (*Id.*) A day later, on January 14, 2009, Plaintiff was examined by Dr. Huskins, who prescribed saline and Tylenol for Plaintiff's dental problems. (*Id.* at ¶ 6). Plaintiff was again examined by Dr. Huskins on January 23, 2009, and prescribed saline and Tylenol. (Doc. 26, ¶ 7).

On January 25, 2009 Plaintiff complained he had a hole in one of his teeth and it hurt when he ate or drank something, and the salt water was not helping. (*Id.* at ¶ 8). Plaintiff states "this is when I bit into a car[r]ot and chip[p]ed [my] tooth and had to pack it with toothpast[e] [until] they pulled it. (*Id.*) I was missing 1/4 of my tooth." (*Id.*)

-2-

On January 28, 2009, Plaintiff complained he had been treated by the "house doctor" about his tooth and the salt water was not helping. (*Id*. at ¶ 9).  Plaintiff further stated he was due to have ten teeth pulled the previous week (due to an appointment made prior to incarceration) and requested to see a dentist. (Doc. 36, ¶ 9).  Two days later, on January 30, 2009, Plaintiff was examined by Dr. Huskins and was prescribed Cipro[1] and Tylenol. (*Id*. at ¶ 10).

On February 6, 2009, Plaintiff was again seen by Dr. Huskins for dental complaints, and was prescribed saline for five days. (*Id*. at ¶ 11).  On February 11, 2009, Plaintiff was again seen by Dr. Huskins for dental problems and was prescribed bactrim[2]. (*Id*. at ¶ 12).  On February 17, 2009, Plaintiff again requested medical care for his teeth, complaining that anything cold that hit his tooth caused it to hurt. (*Id*. at ¶ 13).  Plaintiff was examined by Dr. Huskins on February 20, 2009 and was prescribed Tylenol and saline. (Doc. 25, ¶ 14).

Plaintiff complained on February 23, 2009, that his teeth still hurt and he needed to see the dentist; he was to see the doctor. (*Id*. at ¶ 15).  Plaintiff was treated on February 25, 2009, and prescribed saline for five days. (*Id*. at ¶ 16).

Plaintiff's next medical complaint was made on April 10, 2009, for a rash developing on his upper arm. (*Id*. at ¶ 21).  Plaintiff was

---

[1]  Ciprofloxacin is used to treat or prevent certain infections caused by bacteria.  National Center of Biotechnology Information, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000878 (last viewed September 2, 2010).

[2]  Bactrim is also known as Co-trimoxazole and is a combination of trimethoprim and sulfamethoxazole, a sulfa drug. It eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines.  National Center of Biotechnology Information, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000814 (last viewed September 2, 2010).

examined that same day and was prescribed hydrocortisone for three days. (*Id.* at ¶ 22).

On April 26, 2009, Plaintiff again complained that he had been asking since January to have some teeth pulled, and that salt water would not fix the problem. (Doc. 26, ¶ 23). Plaintiff was placed on the list to see the doctor. (*Id.*) The next day, on April 27, 2009, Plaintiff was seen by Dr. Huskins for his dental complaints and was prescribed saline. (*Id.* at ¶ 24).

On May 3, 2009, Plaintiff put in a medical request to have a tooth pulled, and was to see the doctor. (*Id.* at ¶ 25). The next day, on May 4, 2009, Plaintiff was examined by Dr. Huskins and prescribed Tylenol. (*Id.* at ¶ 26). Dr. Huskins also noted Plaintiff's dental exam was unchanged. (Doc. 36, ¶ 26). Plaintiff was told his dental problem "was not bad but it was chip[p]ed." (*Id.*)

On May 6, 2009 Plaintiff put in another medical request to have a tooth pulled, and stated he wanted to keep the Tylenol prescription since it helped, but he still had pain. (*Id.* at ¶ 27). Plaintiff was crushing up the Tylenol and putting it in the chip to help with pain. (*Id.*) The nurse responded that Plaintiff was already receiving Tylenol four times a day. (*Id.*) That same day, the nurse noted "dental appt. to remove broken tooth per Capt. Holly. May 22, 2009, 0900." (Doc. 26, ¶ 28).

The next day, May 7, 2009, Plaintiff requested to speak to Capt. Holly "about dental" "face to face." (*Id.* at 29; Doc. 21-4, p.5). Capt. Holly replied that all medical issues/decisions were made by the doctor. (Doc. 26, ¶ 29).

On May 10, 2009, Plaintiff complained that he had put in a medical

request the past Thursday to have teeth pulled and that salt water was not helping. (*Id*. at ¶ 30). The nurse responded, "[y]ou are on the list for dentist. Will order med." (*Id*.) The next day Plaintiff again complained that he needed to have his tooth pulled. He requested two Tylenol, four times a day. (*Id*. at 31). The nurse replied the medication was ordered that day, and referred Plaintiff to the response. (*Id*.)

On May 12, 2009, Plaintiff again requested to have his tooth pulled and also something stronger prescribed for pain. (Doc. 26 at ¶ 32). Plaintiff was again informed by the nurse that he was on the list. (*Id*.) On May 17, 2009, Plaintiff requested his medication be increased due to pain of his tooth, and the nurse responded the "Tylenol can be increased for a short time only." (*Id*. at ¶ 33). On May 21, 2009, Plaintiff complained he needed his tooth pulled, he was advised that he was on the list to see the dentist. (*Id*. at ¶ 34). On May 22, 2009, Plaintiff was treated by Dr. Harrington and his tooth #15 was extracted. (Doc. 35, ¶ 36). Medical notes, assumed to be Dr. Harrignton's, related to the extraction note there was "gross decay" present and that "area reveals extensive [illegible] decay." (Doc. 21 Ex. 2 at pg. 7).

On August 3, 2009, Plaintiff sought medical treatment for a lump, and he was seen on August 5, 2009, for a cyst on his hip. (Doc. 35, ¶ ¶ 45, 47). Dr. Huskins told Plaintiff there was nothing he could do for it, and sent Plaintiff on his way. (*Id*. at ¶ 47).

On September 21, 2009, Plaintiff complained that his mouth was hurting and the nurse noted Plaintiff was to see the doctor. (*Id*. at 50). Plaintiff states that he saw the doctor for this complaint, (*id*.

at 53), but there is no documentation of this doctor's visit.

Plaintiff has alleged that on April 5, 2009, Deputy Morrison did a search of pod D-149 just before lunch to find some food items which had been retained by the inmates. (Doc. 1, pg. 4). Plaintiff alleges Deputy Morrison then added shampoo to a bottle of salsa and then placed that bottle back in pod D-149. (*Id*.) Plaintiff used salsa from this bottle, not knowing of the shampoo contained therein, and had a "shampoo tast[e]" left in his mouth. (*Id*.)

Deputy Morrison laughed at Plaintiff and the other inmates and told them it "will teach" them not to save food after meal times. (*Id*.) Plaintiff states he submitted a grievance regarding this incident (Doc. 26, ¶ 52), but did not receive the grievance back. (Doc. 1, pg. 4). There is no document in Plaintiff's jail file regarding the shampoo incident. (Doc. 26, ¶ 51)[3]. Plaintiff alleges that as a result of the shampoo incident on April 4, 2009, he was sick to his stomach and had diarrhea. (*Id*. at ¶ 54). Plaintiff does not state he sought any medical treatment for his medical issues resulting from this incident, and the record reflects no grievances or medical requests on the matter. However, Plaintiff did see the doctor for a rash complaint on April 10, 2009, about six days after the alleged incident. (*Id*. at ¶ 22).

In March of 2009, Plaintiff was moved from D pod to E pod so painting could be done in D pod. (Doc. 1, ¶ V). Plaintiff then was informed E pod was a medical pod and that he was living with inmates who had Hepatitis and AIDS. (*Id*.) On March 22, 2009, Plaintiff filed a

---

[3] Plaintiff did not respond to the Defendants' statement of material facts regarding this fact, thus the matter is deemed admitted pursuant to Local Rule 56.1.

grievance, requesting to be moved from E-102 to D-149, because there were inmates in pod E-102 who had Hepatitis A, B, and C, as well as AIDS. (Doc. 21-4). Plaintiff was told he would remain in E-102. (*Id.*; Doc. 1, ¶ V). While Plaintiff is not alleging he contracted Hepatitis, HIV, or AIDS while in the Benton County Detention Center, he alleges inmates with the diseases would use the phones and then not clean the phones after use. (Doc. 26, ¶ ¶ 55, 56). Plaintiff had a chipped tooth at this time. (*Id.*) Also, Plaintiff was moved several times, and the cells were never cleaned after the move. (*Id.*)

## II. __Applicable Law__

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56 (c). The court views the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 134 (8th Cir. 1992). The moving party has the burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. __Discussion__

### A. __Official Capacity Claims__

Plaintiff's official capacity claims are tantamount to suing Benton County. Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of*

*Soc. Servs.*, 436 U.S. 658, 694 (1978). Because *Monell* specifically rejected liability based solely on respondeat superior, *id.* at 691, "[a] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994). Rather, official-capacity liability must be based on deliberate indifference or tacit authorization. *Id.*

Policy or custom official-capacity liability is imposed by 42 U.S.C. § 1983 only for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels ." *Monell*, 436 U.S. at 690-91. In his Response to the Motion for Summary Judgment (Doc. 26), Plaintiff states there was a custom or policy of "refused medical care," "ho[u]sed me with sick inmates without telling me what they were sick with," and not disinfecting the pod after use of the day room or telephones, or disinfecting dishes after use.

Plaintiff has failed to state a custom or policy of denial of medical treatment in support of his claims. Other than his bare allegations, Plaintiff has presented no evidence of a custom or policy of Benton County regarding refusal of medical care.

To the extent Plaintiff is alleging there was a custom or policy of not disclosing the health information of fellow inmates, the Court does not find that any such policy, assuming it exists, is a constitutional violation. *Robbins v. Clark*, 946 F.2d 1331, 1333 (8th Cir. 1991) (holding that prison officials who decline to reveal to the general population the identities of HIV-positive prisoners do not thereby commit an illegal act). In fact, several cases have held the disclosure to an inmate of another inmate's medical history and

diagnosis could result in Defendants violating the inmate's right to privacy. *Nolley v. County of Erie*, 776 F. Supp. 715, 736, 738 (W.D. N.Y. 1991) (red sticker placed on inmate's possessions to indicate her HIV status was violation of right to privacy and due process); *Woods v. White*, 689 F. Supp. 874, 877 (W.D. Wis. 1988), aff'd, 899 F.2d 17 (7th Cir. 1990) (holding unnecessary disclosure to other inmates and staff could violate right to privacy); *Doe v. Coughlin*, 697 F. Supp. 1234, 1243 (N.D. N.Y. 1988) (segregated dorm impermissible in part due to violation of privacy interest).

Some courts have held that disclosure is acceptable if not punitive in nature. *See, e.g., Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999) (disclosure just to gossip is not proper); *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995)  (holding disclosure of HIV status to individuals at risk of infection is acceptable so long as disclosure is not punitive in nature; disclosure to inmate's cellmate was acceptable because of the risk of homosexual activity between inmates and disclosure to the barber was also acceptable given the possibility of transmission if barber were to cut inmate during a shave or haircut).  However, the Court can find no authority that the failure to disclose medical information is a constitutional violation. Thus, BCDC's alleged policy of non-disclosure of the medical conditions of other inmates is not an unconstitutional policy.

Plaintiff also alleges the policies of not disinfecting the day room on a daily basis, not disinfecting dishes, and not cleaning cells between inmate moves are unconstitutional policies. Plaintiff indicates trustees would routinely clean the cells. (Doc. 21 Ex. 4 pg. 9; Doc. 26, ¶ 46).  Further, Plaintiff has not alleged he sought cleaning

supplies and was denied, or that any policy or procedure of Benton County caused him to be denied cleaning supplies to disinfect the phones, day room, or his cell on a daily basis if he wished.  In fact, there is no record of any grievance filed by Plaintiff about his belief his pod was not disinfected daily as it should be.  Plaintiff has not alleged that he has suffered ill-health or other physical harm as the result of unsanitary conditions.[4]

Conditions of confinement are so deficient as to constitute cruel and unusual punishment only where an inmate is denied "the minimal civilized measure of life's necessities;" the Constitution "does not mandate comfortable prisons." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The instant allegations do not suggest, even when viewed in the light most favorable to Plaintiff, and even considering "the evolving standards of decency that mark the progress of a maturing society,"

_____

[4]  Plaintiff states he feared he would contract AIDS or Hepatitis A, B, or C from the failure of daily disinfection of the day room, dishes, and phones, as well as from the failure to clean cells between inmate moves.  AIDS is transmitted by specific bodily fluids: blood semen, vaginal secretions, and breast milk, coming into contact with a mucous membrane or damaged tissue of another person, or by being directly injected into the blood-stream of another.  Center for Disease Control, http://www.cdc.gov/hiv/resources/qa/transmission.html (last visited Aug.  27, 2010).  The possibility of environmental transmission is remote.  *Id.* According to the CDC, Hepatitis B is not spread through coughing or sneezing.  Center for Disease Control, http://www.cdc.gov/hepatitis.html (last visited Aug.  27, 2010).  Therefore, disinfectant would not be likely to aid in the prevention of Hepatitis B.  Hepatitis A is often spread through the failure to maintain good hand washing practices, but transmission by saliva has not been demonstrated among human populations.  Center for Disease Control, http://www.cdc.gov/hepatitis/HAV/index.html (last visited Aug.  27, 2010).  Furthermore, Hepatitis C is contracted through large or repeated percutaneous exposures to infected blood.  Center for Disease Control, http://www.cdc.gov/hepatitis/HCV/HCVfaq.htm#b1 (last visited Aug. 26, 2010).  Thus, daily disinfecting practices are not likely to be a major contributor to reducing the spread of these diseases as contracting them requires exposure beyond coughing, sneezing, or using the phone after use by an infected person.  Additionally, the failure of daily disinfection can not be found to make Plaintiff or other inmates exposed to an unreasonable risk of any of these diseases.

*Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), that plaintiff has been deprived of the minimal civilized measure of life's necessities. *Cf.* *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)(finding conditions inhumane when for two years a prisoner was placed in a cell covered with filth and human waste, requests for remedial measures when unheeded, and he was denied access to cleaning supplies).

   B.  **Individual Capacity Claims**

      1.  Failure to Protect From Exposure to Disease

   The standard for Plaintiff's claim that Defendants failed to protect him from exposure to disease by housing him with inmates with AIDS and Hepatitis is whether prison officials failed to "reasonably respond to the risk" of infection, as established in the Eighth Circuit in *Glick v. Henderson*, 855 F.2d 536 (8th Cir. 1988). Plaintiff's burden is to show that there is "a pervasive risk of harm to inmates" of contracting the AIDS virus and/or Hepatitis and that there is "a failure of prison officials to reasonably respond to that risk" amounting to deliberate indifference to a pervasive risk of harm. *Glick*, 855 F.2d at 539-40; *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984). The undersigned concludes that Plaintiff cannot make that showing as a matter of law.

   Defendants are entitled to summary judgment as a matter of law on Plaintiff's allegations that not cleaning phones, day room, or cells after the use by inmates with AIDS and/or Hepatitis exposed him to a risk of contracting these diseases because these are claims based on everyday contact, and such claims were rejected by the Eighth Circuit in *Glick*. *Id.* The possibility of transference of AIDS or Hepatitis through these means, if such a possibility can be said to exist, is

simply too remote to provide the proper basis for Plaintiff's complaint. *See also* fn.2, *supra*.

## 2.   Denial of Adequate Medical Care

Plaintiff has made a claim he was denied and delayed adequate medical care because he chipped a tooth on or about January 25, 2009, and did not get the tooth pulled until May 22, 2009, almost four months later.  During the intervening time, Plaintiff saw Dr.  Huskins at least eight times and was prescribed saline, Tylenol, bactrim, and Cipro for his dental complaints.

Plaintiff made no dental complaints during the month of March, 2009.  However, he did complain throughout the month of February, 2009, with the last complaint on or around February 25, 2009.  Plaintiff then resumed complaining around two months later, on April 27, 2009. Ultimately, on May 6, 2009, about nine days after he resumed filing medical complaints, an appointment was made for Plaintiff to have his chipped tooth pulled.  The tooth was pulled on May 22, 2009.

As Plaintiff was a pretrial detainee[5] during the time of his dental complaints, his claim of inadequate medical care is analyzed under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment.  The standard of culpability for such a claim is deliberate indifference to the inmate's serious medical needs.  *Hartsfield V. Cloburn*, 491 F.3d 394, 396 (8th Cir.  2007) (holding the Eighth Amendment does not govern the treatment of pretrial detainees, but under the Due Process Clause of the Fourteenth amendment, deliberate indifference is the appropriate standard for a denial of medical care

---

[5]  Plaintiff pled guilty to his charges on September 17, 2009.  (Doc. 26, ¶ 49).

claim).

        "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103(1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106.

*Dulany*, 132 F.3d at 1239; *see also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

        In this case, Plaintiff complained of dental pain from his booking in January throughout February, and again in April and May. Plaintiff informed the doctor that the pain medication and saline treatment were not working, but that same treatment was prescribed to Plaintiff without change.

        The Court also notes the Defendants, in their Motion for Summary Judgment, provide no medication logs of when and if Plaintiff received his medications. While Defendants do provide an exhibit of "medical records" these records are mostly illegible. In fact, it is difficult to ascertain where the information stated in the Defendants' Statement of Facts is documented in the records. Moreover, there is no affidavit from Dr. Harrington or Dr. Huskins regarding their examinations of

Plaintiff or the results of these examinations.  On the whole, the supporting medical documents are incomplete.

Not until four months after his first complaints of dental pain was Plaintiff scheduled for extraction, despite his repeated requests for effective pain relief or for extraction, and despite his indications he was scheduled to have an extraction prior to his incarceration.  At the time of the extraction, "# 15," assumed to be a reference to the tooth #15 which was set for extraction, was described as having "gross decay." (Doc. 21 Ex. 2 at pg. 7).  Further, "area reveals extensive [illegible] decay."  *Id.*

Liberally construing the pro se complaint, *see Atkinson v. Bohn*, 91 F.3d 1127, 1128-29 (8th Cir. 1996) (per curiam), Plaintiff has claimed he was denied adequate medical treatment for his tooth, and a material issue of fact exists as to whether Defendants were deliberately indifferent to Plaintiff's serious dental needs. *Cf. Moore v. Jackson*, 123 F.3d 1082, 1084-87 (8th Cir. 1997) (per curiam) (genuine issue of material fact existed on whether prison dentist knew of inmate's serious dental condition, where inmate repeatedly reported severe tooth pain in medical service requests and grievances, but care was delayed from April to December); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (three-week delay in dental care, coupled with knowledge that inmate was suffering, can support Eighth Amendment violation); *Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994) (per curiam) (summary judgment reversed where there was evidence that dentist learned of inmate's tooth-related swelling, headache, and severe pain on March 19, but did not remove tooth until April 15); *Harrison v. Barkley*, 219 F.3d 132, 134, 136-38 (2d Cir. 2000)(reversing grant of summary judgment based on qualified

immunity, and finding Eighth Amendment violation, where prison dentist refused to treat inmate's tooth cavity only because inmate refused extraction of another diseased tooth; if left untreated, tooth with cavity will degenerate, likely cause severe pain, and eventually require extraction and perhaps further invasive treatment).

Moreover, the record also shows that on May 7, 2009, Plaintiff attempted to speak with Captain Holly about his dental complaints, but was told "all medical issues/decisions are made by the doctor." (Doc. 21 Ex. 3 pg. 5). On May 6, 2009, the jail medical record indicates "Dental appointment to remove broken tooth per Cpt. Holly, May 22, 2009 0900." (Doc. 21 Ex. 2 pg. 11). Clearly Captain Holly had knowledge of Plaintiff's serious medical needs, and was in some way responsible for making or approving the dental extraction appointment.[6]  While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, No. 09-1862, 2010 WL 2813551 (8th Cir. July 20, 2010)(citing *Crooks*, 872 F.2d at 804)).  Thus Summary Judgment is due to be denied regarding Plaintiff's claim of deliberate indifference to serious dental needs.

3.  Shampoo Placed in Food

According to Plaintiff Deputy Morrison put shampoo in a bottle of salsa, which Plaintiff then used.  Plaintiff states Morrison placed the shampoo in the bottle of salsa on April 4, 2009, after Morrison had searched pod D-149 for food which had been held back by the inmates.

---

[6]  While Captain Holly has not been named as a defendant at this time, it is the recommendation of the undersigned that he be so named and served. *See* Section IV, *infra.*

After Plaintiff and other inmates ingested the shampoo, Morrison laughed and indicated he had placed the shampoo in the salsa to "teach" the inmates not to save food.

Defendants maintain no such incident occurred but if it did it would not violate Plaintiff's constitutional rights without a showing of an actual physical injury. They maintain Plaintiff's allegation that he had the taste of shampoo in his mouth is not an actual physical injury. Instead, they maintain Plaintiff suffered at most a non-actionable *de minimis* injury. In his response to the Motion for Summary Judgment, Plaintiff stated he also suffered stomach pains and diarrhea as a result of the incident. (Doc. 26, ¶ 54). The record does not contain an incident report about the incident or any affidavit from Morrison.

Plaintiff's allegation is essentially that Morrison, with malicious intent, was deliberately indifferent to Plaintiff's health and safety and exposed him to harm without a penological purpose, and that Plaintiff suffered an actual physical injury in the form of stomach pains and diarrhea. If true, these allegations could state a constitutional claim. *See Robles v. Coughlin,* 725 F.2d 12, (C.A. NY. 1983) (holding allegation of intentional contamination of food by prison officials sufficient to state a claim); *see also Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (applying deliberate indifference standard to contaminated food claim).

Defendants also maintain this claim must be dismissed because Plaintiff submitted no grievance regarding it. Plaintiff agrees the jail file contains no document regarding the incident (Doc. 26, ¶ 51), but asserts he did submit a grievance regarding this issue and did not

receive any response back.  (Doc. 1, Doc. 26 at ¶ 52).  Clearly, there is an issue of fact as to whether Plaintiff exhausted his administrative remedies.

### 4.  Defendants Petray and Ferguson

Plaintiff has failed to allege or create any genuine issue of material fact regarding the personal involvement of Defendants Petray and Ferguson.  Plaintiff has not alleged that Defendants Petray and Ferguson personally were involved in the alleged denial of dental care or that either defendant saw Deputy Morrison place shampoo in Plaintiff's food without intervening.

A supervisor may be held liable if he directly participated in the constitutional violation, *see Webster v. Gibson*, 913 F.2d 510, 514 (8th Cir. 1990), or he may be held liable when he fails or refuses to intervene when a constitutional violation takes place in his presence. *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).  Here, Plaintiff has provided no evidence of knowledge, action, or inaction by Defendants Petray and Ferguson relative to his actionable claims.

## IV.  **Conclusion**

Accordingly, it is the Report and Recommendation of the undersigned that the Motion for Summary Judgment (Doc. 19) be **GRANTED in part and DENIED in part**.  The undersigned recommends Summary Judgment be **DENIED** regarding shampoo being intentionally placed in Plaintiff's food by Officer Morrison, and regarding Plaintiff's claims of denial of dental care by Dr. Huskins.  I recommend Summary Judgment be **GRANTED** as to all other claims; including all claims made against Defendants Ferguson and Petray.

Further, Plaintiff has not named Captain Holly as a defendant in this case, but Captain Holly was involved in Plaintiff's claims of denial of medical care. Accordingly, in the event this Report and Recommendation is adopted, it is recommended that Captain Holly be named as a defendant to this case and the Complaint and this Report and Recommendation, along with the Order from the district court, be served on Captain Holly. Captain Holly should also be directed at the time of his Answer to identify the nurse who responded to Plaintiff's medical requests as noted in the Defendants' Statement of Facts. (Doc. 21).

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636 (b) (1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of September 2010.

/s/ Erin L. Setser
HON. ERIN L. SETSER
U.S. MAGISTRATE JUDGE